**AFFIDAVIT IN SUPPORT OF A**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Bryan Brunner, being duly sworn, state as follows:

**Introduction**

1. I am a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations (HSI). I have served in HSI since January 2004, and have successfully completed criminal investigator training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I am currently assigned to the Counter-Proliferation Investigations Group. I have received specialized training on how to conduct investigations involving the illegal exportation of weapons, technology, and other controlled commodities, as well as the federal criminal statutes that regulate and, in certain instances, prohibit the export of U.S. controlled commodities, including weapons, weapons systems, services, military equipment and technology. I have also received training regarding immigration laws of the United States, including Titles 8 and 18 of the United States Code and Title 8 of the Code of Federal Regulations.

2. While working for HSI, I have conducted and participated in investigations of violations of federal law including the unlawful export of controlled U.S.-origin arms, technology, and commodities, as well as prohibited transactions by U.S. persons with sanctioned countries. I am empowered by law to investigate and make arrests for violations of federal law, including the unlawful export of controlled U.S.-origin arms, technology, and commodities to destinations outside the United States as specified in the International Emergency Economic Powers Act (IEEPA) 50 U.S.C. §§ 1701-1706, the Iranian Transactions Regulations (ITR) Title 31, Code of

Federal Regulations, Part 560[1], the Arms Export Control Act, (AECA) 22 U.S.C. § 2778, and the International Traffic in Arms Regulations (ITAR), 22 C.F.R. Parts 120 et. seq.

3.      As a Special Agent with HSI, I am familiar with the federal laws relating to the unlawful export of controlled U.S.-origin arms, technology, and commodities from the United States as specified and regulated by the U.S. Department of State, Directorate of Defense Trade Control (DDTC), the U.S. Department of Commerce, Bureau of Industry and Security (BIS), and the U.S. Department of the Treasury, Office of Foreign Asset Controls (OFAC).  I am also familiar with related laws, the interpretation and application of federal laws and federal court procedures, and have previously assisted in the execution of numerous federal search and arrest warrants.  I have participated in numerous investigations of violations of U.S. laws relating to the unlawful export of controlled U.S.-origin arms, technology, and commodities restricted for export for reasons of national security, foreign policy, anti-terrorism and embargoed destinations.  As a Special Agent with HSI, I have received considerable training related to identifying the techniques, methods, and procedures employed by groups, organizations, companies, corporations, and individuals to export goods and commodities in violation of U.S. export laws. In addition, I have received specific instruction and training in the conduct of criminal investigations associated with export law violations, which included investigations associated with violations of the IEEPA, and the ITR.

4.      I am submitting this affidavit in support of an application for a criminal complaint (and an arrest warrant) charging a violation of IEEPA and the ITR for **Seyed Motjaba NEJAD HASHEMI**, also known as Mo Hashemi (hereinafter HASHEMI), who was born on December 30, 1938, and is a dual citizen of Canada and Iran, and a holder of a United States Green Card

---

[1]  Effective October 22, 2012, the Department of the Treasury renamed and reissued the Iranian Transactions Regulations as the Iranian Transactions and Sanctions Regulations.

who is currently residing in Canada.  The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on documents that I have reviewed, and on my training and experience.  Because this affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation.  Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of this application for a criminal complaint and an arrest warrant.

### Relevant Export Laws and Regulations

5.     IEEPA authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declared a national emergency with respect to that threat.

6.     Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

7.     On May 6, 1995, the President issued Executive Order No. 12959, adopting and continuing Executive Order No. 12170 and prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. Executive Order No. 12959, as consolidated with other prior Executive Orders in, and supplemented by, Executive Order No. 13059 (August 19, 1997), and as extended by Presidential Notice of March 10, 2004 (69 Fed. R. 12051), was in effect at all times relevant to this investigation.

8.      The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated ITR implementing the sanctions imposed by the Executive Orders.

9.      The ITR generally prohibited any person from exporting or causing to be exported from the United States any goods or technology without having first obtained an export license from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which was located in the District of Columbia.  The ITR were in effect at all times relevant to this Complaint.  The ITR imposed, among others, the following prohibitions:

>   Section 560.203 - Evasions; attempts.
>
>   Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.
>
>   Section 560.204 - Prohibited exportation, reexportation, sale or supply of any goods, technology, or services to Iran.
>
>   Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
>   (a)   Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . . .
>
>   Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;

4

> Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology or services that have been exported from the United States is prohibited if:
>
> (1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and
>
> (2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

10.    OFAC regulations did not authorize, and there is no applicable statutory exemption for, the transaction that is the subject of this affidavit.  OFAC has no record of any licenses being issued to HASHEMI for exports to Iran as of June 2014.  IEEPA makes any willful violation or attempted violation or conspiracy to violate the ITR unlawful.  *See* 50 U.S.C. § 1705.

## **PROBABLE CAUSE FOR SEYAD MOTJABA NEJED HASHEMI**

### **Evidence of Hashemi's Knowledge of U.S. Sanctions**

11.    On or about March 20, 2010, HASHEMI traveled from Canada to California.  HASHEMI was selected for a border inspection by officials from U.S. Customs and Border Protection (CBP) for Pre-Clearance in Canada.  During the inspection, the HSI Assistant Attaché, Canada, participated in an interview of HASHEMI.

12.    HASHEMI stated he was born in Iran in 1938, and had obtained an MBA degree from the Iran Center for Management Studies in 1975.  He further stated he had immigrated to Canada in 1997, became a Canadian resident in 2000, and a Canadian citizen in approximately 2004-2005.  HASHEMI also stated he had become a Lawful Permanent Resident of the United States on July 30, 2005.

13.     HASHEMI told the interviewing officials he worked as a consultant from 1997 to 2008, at a company in Richmond Hill, Ontario. HASHEMI also told the interviewing officials he worked for an inspection company in Houston, Texas.

14.     HASHEMI is knowledgeable about the U.S. embargo on Iran. This knowledge dates back to when he worked as an engineer in the oil industry in Iran. HASHEMI told interviewing officials he knew the embargo started in 1996 and explained how it impacted his work. Specifically, HASHEMI explained that when he worked on the maintenance of gas turbines in Iran, Iran could not obtain goods, including gas turbines, from the United States.

15.     On January 27, 2012, HSI executed a search warrant on HASHEMI's email account, mojtabanh@hotmail.com. The search revealed that on January 11, 2011, HASHEMI received an email from Individual A, titled "Important Sanctions Doc." This email contained no text in the body, but had an attachment entitled "How U.S. Laws Can Affect Your Personal Affairs in Iran" by Farhad R. Alavia. On the first page of this document it describes a U.S. person as being a "U.S. citizen or a Permanent Resident (Green Card holder) even if you do not live in the United States." The document also states that "sanctions apply to generally all U.S. Persons." It further states that "U.S. sanctions against Iran are very strict and very comprehensive."

### Attempted Export to Iran of U.S. Origin Measuring Tapes

16.     On or about June 21, 2012, HASHEMI arrived in Toronto, Canada, from the United States after an Iranian college class reunion held in Las Vegas, Nevada. After conducting a search of HASHEMI, the Canadian Border Security Agency (CBSA) found HASHEMI in possession of two U.S.-made measuring tapes used to measure the circumference of pipes or tubes in the aviation and oil industry. "Precision Outside Diameter" measuring tapes made of 1095 clock spring steel and are used to measure the circumference of pipes or tubes in the

aviation and oil industry. The tapes are delivered with a Calibration Report traceable to the National Institute of Standards and were purchased for two hundred and seventy-two dollars. The tapes were manufactured by Company A in California.

17. On July 27, 2012, HASHEMI was traveling to Iran from Canada and was the subject of an out-bound inspection by the CBSA. The contents of his luggage revealed what appeared to be the same two U.S.-made measuring tapes that were in his possession when he entered Canada on June 21, 2012. On this occasion, HASHEMI was attempting to export the U.S. goods to Iran. CBSA detained the tapes pending determination as whether they are controlled by the Export Imports Act of Canada. The attempted export of the US made measuring tapes to Iran was in contravention of; or contrary to Section 95 of the Canada Customs Act ("CCA") and the reporting of exported goods regulations, and Section 13 of the Export Import Permits Act ("EIPA").

18. On August 2, 2012, HSI executed a second email search warrant on HASHEMI's email account, mojtabanh@hotmail.com. The results of that search revealed that HASHEMI was attempting to procure the aforementioned measuring tapes for an Iranian entity.

19. In an email dated March 21, 2012, from HASHEMI to Individual B, a person believed to be in Iran, HASHEMI states, "Please send me the information about the turbine measuring tape that you need."

20. In a reply email on April 2, 2014, Individual B informs HASHEMI of the exact type of tape he needs. "The [Company A] Tape that we need is 12'-14. Please report the final price for [Company B] before purchasing." The email is signed "[Individual B]." An open source search shows Company B being located in Tehran Iran.

21.     On April 3, 2012, HASHEMI responded to Individual B by email, stating, "I am still in Iran. I will bring it with me next time I come back. Probably next month, I will bring it for you from Canada."

22.     Subpoena information obtained from Company A shows HASHEMI ordered the tapes online and paid for them by credit card. The subpoena also revealed that the address Company A has for HASHEMI is 5699 Kanan Road #382 Agoura Hills, California 91301. This is the same address the U.S. Citizenship Immigration Service has for HASHEMI's residence. Company A also lists his email as mojtabanh@hotmail.com. That is the same email address as the target email of the search warrants described above.

23.     In an email from HASHEMI dated September 4, 2012, HASHEMI writes a complaint to the CBSA, HASHEMI alleges the tapes are for something other than turbines. He contends, "My nephew in Tehran, who is the same age as my son, has a hobby of design and making fiber glass items. The measuring tapes are for copying the water ski pieces." This clearly contradicts the aforementioned emails with Individual B, obtained via HSI's search warrant. It is also proof of Hashemi's knowledge that the items are restricted, and that he was acting willfully by trying to transport them to Iran.

### Identification of Hashemi

24.     The searches of HASHEMI's email account provided further corroboration of his identity. HASHEMI's email account revealed an email dated December 25, 2011, containing a copy of his Canadian passport and Canadian naturalization certificate. The passport identifies him as follows:

    Surname: Nejad Hashemi

    Given names: Seyed Mojtaba

Date of Birth: December 30, 1938

Place of Birth: Rasht, Iran

Nationality: Canadian

25. U.S. Department of Homeland Security Citizenship Immigration Service records show HASHEMI was issued Alien Registration number 057921112. The biographical information listed above is consistent with the biographical information in his Alien file.

## CONCLUSION

26. Based on the information set forth above, it is respectfully submitted there is probable cause to believe that Seyed Motjaba NEJAD HASHEMI, also known as Mo Hashemi, has willfully violated the following statutory and regulatory proscriptions:

-Title 50 U.S.C. § 1705, (IEEPA) 31 C.F.R. Parts 560.203 and 560.204 (ITR)

Therefore, I request that a criminal complaint be issued charging **Seyed Motjaba NEJAD HASHEMI**, also known as Mo Hashemi, accordingly, and that an arrest warrant be issued.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

_____
Bryan Brunner, Special Agent
Homeland Security Investigations

Subscribed to and sworn before me on this _____ day of June 2014.

_____
United States Magistrate Judge